The Committee on Elections, to whom was referred the petition of Charles H. Mansfield for a recount of the votes east for representative in the thirteenth Essex district, for an investigation of certain alleged illegal voting for representative from said district, *4 and asking that said petitioner may be declared to have been duly elected a member of this House, having heard the parties, present the following report: —
The thirteenth Essex representative district comprises the towns of Saugus, Topsfield, Lynnfield and Middleton. In this district seven hundred and fifty-two votes were cast for representative. Of these, Charles S. Hitchings received three hundred and sixty-eight, Charles H. Mansfield three hundred and sixty-four, and all others twenty, as appeared from the returns from said district, and said Charles S. Hitchings was declared duly elected as representative from said district, and a certificate of election, in due form of law, was issued to said Hitchings. No evidence was offered of any inaccuracies in the count in said district, and any claim thereto was expressly waived by the petitioner.
One James W. Ray voted at said election in the said town of Lynnfield for the said Charles S. Hitchings for representative from said district. On the thirtieth day of October, A.D. 1885, said Ray moved his family and household furniture to Lynn, in said county, and- out of the said district, and there took up his permanent abode, having then no intention to resume his former residence in Lynnfield.
One Charles Blakeley voted at said election in the said town of Saugus for the said Hitchings for representative from said district. Said Blakeley had spent the greater part of the year in Saugus for the last four years, and had worked in Lynn and boarded there during the winter months, with the exception of one winter when he had worked in Lynn and boarded in Saugus. 1-Ie had been assessed for a poll tax and had been a registered voter in Saugus for several years. He testified that he was only temporarily in Lynn, where he expected to remain until about the first of April next, and expected to return to Saugus next summer ; that he was unmarried, and had no parents living. The testimony of this witness was contradictory.
Under the third ' amendment to the Constitution, residence within the town or district, in which the right to vote is claimed, for six calendar months preceding the election is necessary. “Residence,” as used in the Constitution, is “equivalent to the familiar term domicil.” Opinion of the Justices, 5 Met. 587, 588. Domicil is a question of fact. A man must have a domi-cil somewhere, and he cannot have more than one domicil at the same time for one and the same purpose. It is obvious, then, that an existing domicil continues until another is acquired, and that the acquisition of a new domicil immediately terminates the *5 preceding one. Thorndike v. Boston, 1 Met. 242; Opinion of the Justices, supra; Ordway v. Howe, Loring & Russell’s Election Cases, 3. So, too, it is well settled that a “domicil once existing cannot be lost by mere abandonment, even when coupled with the intent to acquire a new one, but continues until a new one is in fact gained.” Shaw v. Shaw, 98 Mass. 158.
Applying these principles to the present case, it is clear that Ray was not a resident of the town and district for six calendar months preceding the election, and that his vote was illegal, and should be deducted from the plurality of four votes received by said Hitchings according to the official returns. Applying the same principles to the case of Blakeley, your committee came to the conclusion.that he had acquired no new domicil in Lynn, even if he had left Saugus with the intention of acquiring one elsewhere, and that he was, so far as residence was concerned, a legal voter in the town of Saugus, and that his ballot should be counted.
It was also claimed that the clause of the Constitution requiring the payment of a State or county tax as a prerequisite to the right to vote had not been complied with, and that certain votes should be thrown out for that reason ; and that there were other alleged irregularities, sufficient in number to change the result of the election. But independently of these alleged irregularities, which were not fully investigated and consequently are not reported on, we believe that there is still another question in issue that disposes of this case, and renders it unnecessary to continue the investigation.
In chapter 298 of the Acts of 1884 it is provided (section 27) that the registrars of voters in towns shall, at least thirty days before the Tuesday next after the first Monday in November annually, make correct alphabetical lists of all the persons qualified to vote for the several officers to be elected at that time ; and shall, at least thirty days before said Tuesday after the first Monday in November annually, cause such lists in towns to be posted up in two or more public places.
Section 21 of the same statute provides that, after the lists of qualified votes are printed and posted as now required by law, no name shall be added thereto, unless the applicant for registration appears in person before the registrars or assistant registrars and proves his claim to be registered; while section 20 provides that the registrars before registering any person whose qualifications have not been previously determined by them shall examine him under oath in regard to his qualifications to vote, and shall require such person to write his name and read in the official *6 edition thereof at least three lines of the Constitution, other than the title, in such manner as to show that he is not prompted nor reciting from memory, before they place his name on said register, unless such person is exempted by article 20 of the amendments to the Constitution.
It appeared in evidence that at least fifty persons were registered in the town of Saugus, after the posting of the lists as required by section 27, without appearing in person before the registrars as required by section 21 of the statute. It also appeared that at least thirty-two of these voted in said election; but who these were, and whether there was a still larger number of persons so registered and voting, your committee were unable to decide conclusively without the personal examination of over one hundred persons. No question has been made as to the legal qualifications of such persons to vote in said elections, providing they had been properly registered.
Was such registration illegal, and should the votes of persons so registered be rejected ? It cannot be denied that under section 21 it was the duty of the registrars to require the personal attendance of all applicants for registration. The statute is explicit in its terms, and no other construction was claimed at the hearings before the committee.
The more difficult question is whether the provisions of section 21 are mandatory or directory. Was their observance essential to the validity of the election, or simply an irregularity in the manner of conducting it? Is the requirement of personal presence as a prerequisite for registration a condition upon which the right to vote depends ?
There are many cases in which it has been held that certain informalities in election proceedings did not render the vote itself illegal. A very large number of these have been cases where some irregularity existed in the proceedings of the election officers after the election. Johnson v. Cole, Loring & Russell's Election Cases, 36; Beck v. Plummer, Ib., 40; Newcomb v. Holmes, Ib., 57; Haynes v. Hillis, Ib., 300. In such cases, where the vote has been fairly and legally expressed, and can be determined, no subsequent act is allowed to operate to its exclusion. In other cases, the failure to properly call the meeting has been held insufficient to invalidate the election, it being shown that in fact notice thereof was given, and that no injury resulted from the failure to observe such provisions. Haws v. Darling, Loring & Russell’s Election Cases, 18; Newcomb v. Holmes, Ib., 57; Bird v. Merrick, Ib., 115; Hillman v. Flanders, Ib., 338; Commonwealth v. Smith, 132 Mass. 289. In cases like these the statute provisions *7 have been construed to be directory. In both of these classes it will be noticed that the irregularity was that of the election officers and that no fault or remissness could be imputed to the electors.
The case of Whitaker et al., petitioners, Loring & Russell’s Election Cases, 360, was called to the attention of the committee, but that case is not an authority on the point in controversy. It was a case arising under sections 4 and 12 of chapter 7 of the Public Statutes, providing for the use of envelopes for the enclosure of ballots. The statute prescribes the kind of envelope to be used, and declares that no other envelope shall be used. A vote was cast in an envelope, but not of the kind prescribed by statute. It was held, in the Senate, that the vote should be counted. A similar case before this House was decided differently. Taft v. Cole, Loring & Russell’s Election Cases, 45. But whether the case of 'Whitaker was rightfully decided is immaterial. The decision in that case was largely based upon a comparison of the various statutory provisions relative to the subject. The fact that the purpose of the statute was to secure the privilege of secrecy to the voter marks the wide distinction between that case and the present.
Where a statute expressly provides that a failure to observe its provisions shall invalidate the election, or any votes cast therein, there can be no doubt as to its construction. In other cases the nature and purpose of the thing to be done, the antecedent legislation and the particular language used must be considered. As a general rule, however, negative words make a statute imperative. Dwarris on Statutes, 611.
In the present case the statute is direct and positive. “ It is prohibitory in expression and effect; it does not say simply that a certain thing shall be done, but it declares in unequivocal terms that a certain thing shall not be done.” Taft v. Cole, ubi supra. It declares that “no name shall be added” to the list “ unless the applicant appear in person.” This provision goes to the ascertainment of the qualifications of the electors, and does not come within the principle of the cases before considered.
Section 9 of chapter 7 of the Public Statutes supplements this provision, and provides that no person shall vote at an election whose name has not been previously placed on the list. It will be noticed that this section and the one under discussion are so similarly drawn that any construction founded on the language used must be identical in each case. The provisions of section 9S above cited, have been held to be mandatory and their non-observance a proper ground for the rejection of votes cast in violation of their provisions. Capen v. Foster, 12 Pick. 485; Whitaker et al., petitioners, supra.
*8 Both provisions are, moreover, directed to the same purpose, namely, to secure the proper proof of the qualifications of those desiring to exercise the right of suffrage, and to prevent error and fraud in elections. These sections must be read together, as both relate to the same subject-matter. No name shall be added to the list unless the applicant appear in person, and no person shall vote unless his name is on the list. Your committee came to the conclusion that the section of the statute under consideration was mandatory, and that it came within the principle laid down in Capen v. Foster, supra.
To hold these provisions directory merely would leave the determination of the voter’s qualifications to evidence heard after the election, and to nullify all statutory provisions requiring the determination of the right of suffrage prior to casting the ballot, placing the burden on those who claim illegal votes were cast, not only to search out the alleged illegal voters, but to show their want of qualifications, instead of requiring them to appear and prove their right to the ballot.
This is not wholly a new question. A leading authority (Brightly, Leading Cases on Elections, 452) says: “ Perhaps the most important question which has arisen under this head of the election law is, whether the omission of the election officers to require from unregistered voters the preliminary proof required bylaw is a mere irregularity or a matter of substance which renders such votes absolutely illegal. ... If the election officers receive a vote without that preliminary proof which the law makes an essential prerequisite to its reception, such vote is as much an illegal one as if the voter had none of the qualifications required by law. The voter might not be able to produce the legal preliminary proof, and it would not appear to be just to the candidates to permit a vote to be made legal by evidence subsequently procured, which was absolutely illegal when received by the officers.” See also State v. Hilmantel, 21 Wis. 562. In Michigan, under a statute expressly forbidding all voting by persons not registered, it has been held that all votes cast by legal voters who were not registered, because there had been no board of registration in existence to register before, should be rejected. People v. Popplekom, 16 Mich. 342. And it has been held, by a committee of this House, that a person registered after the expiration of the time fixed by law cannot legally vote. Claflin v. Wood, Loring & Russell’s Election Cases, 353.
The antecedent legislation upon this subject also leads to the same conclusion. Under the Public Statutes (chap. 6, sect. 24) it was the duty of the registration officers to enter on the list all *9 persons known to them to be qualified to vote, and no personal attendance was required in such ease. When this whole subject was carefully revised in 1884 this clause was repealed, and that requiring personal attendance was passed. If the Legislature had intended to leave the determination of qualifications, necessary in order to register, to the unofficial knowledge of the board of registration, this section would not have been repealed.
And, finally, any other construction than that adopted by the committee would lead to the nullification of the law, and to the abuses which it was passed to prevent.
It was admitted at the hearings that the alleged illegal voters had been before the board the preceding year ; that their qualifications, as then existing, had been determined; and that, if they had come before the board in person, these qualifications, so far, as they were of such a nature as to continue from year to year without change, need not have been redetermined. (Sect. 20, chap. 298 of the Acts of 1884.) But this cannot change the result. Section 21, requiring personal appearance, cannot be construed to mean one thing for one class of persons and directly the opposite for another. Its construction must be uniform in all cases. But apart from this, the determination of the right to vote depends upon many considerations of a fluctuating nature which may exist at one time and not at another. Chief Justice Shaw, in Capen v. Foster, supra, gives many of the qualifications as follows: —
“ The right of an individual person, claiming the privilege of voting, may involve an inquiry into the fact of citizenship, sex, age, domicil within the Commonwealth, domicil within the town or district, the payment of taxes, exemption by law from the payment of taxes, and the fact of his being a pauper, or under guardianship, or otherwise.”
The requirement of personal presence is also necessary to prevent the placing of names upon the list without the knowledge or consent of the person registered.
It was claimed at the hearings, and was in evidence, that part, at least, of those so registered would have personally appeared had not the registrars construed the law as not requiring personal appearance in all cases. But the old rule of almost universal application must apply. Ignorance of the law excuses no one. The mistake of a board of registrars cannot affect the construction of an act of the Legislature, and cannot operate to change its intent.
Your committee came'to the conclusion that the votes of all persons registered in violation of the provisions of section 21 of the statute should be rejected. The illegal registration, at the *10 outside, was confined to a little over one hundred persons, of whom between eighty-five and ninety voted. At least fifty persons were wrongfully registered. No definite conclusion could be reached without the examination of over one hundred persons.
In view of the nature and extent of these irregularities, permeating as they do the entire poll of Saugus, and the utter disregard of the law as to registration, it is exceedingly doubtful and uncertain what the vote of Saugus was; and after any examination, however extensive it might be, the same doubt and uncertainty would exist.
The committee therefore report that it is impossible to determine, with fairness and certainty, the result of said election. Perry v. Montague, Loring & Russell’s Election Cases, 200; Splaine v. McGahey, Ib., 393.
They therefore report a resolution that the seat be declared vacant, and a precept issued for a new election. *